UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ROSALY RAMIREZ, ET AL.,

Plaintiffs,

v. 13 CV 2367 (JGK)

RIVERBAY CORP.,

Defendant.

------------------------------x

New York, N.Y.
May 15, 2015
2:44 p.m.

Before:

HON. JOHN G. KOELTL

District Judge

APPEARANCES

MCLAUGHLIN & STERN
Attorneys for Plaintiffs
BY: LEE S. SHALOV
BRETT R. GALLAWAY
-and-
LAW OFFICES OF LOUIS GINSBERG
Attorneys for Plaintiff
BY: LOUIS GINSBERG

CHRISTOPHER A. SMITH
Attorney for Defendant
-and-
TRIVELLA & FORTE
Attorneys for Defendant
BY: JONATHAN M. BARDAVID
SCOTT P. TRIVELLA

(In open court; case called)

THE COURT: Good afternoon.

This is an application for final approval of the settlement and the request for attorneys' fees. I've read the papers. I'll listen to the parties.

MR. SHALOV: Good afternoon Lee Shalov, McLaughlin and Stern for the plaintiffs.

We are here before the court to present for final approval the settlement of a class action on behalf of Riverbay hourly employees. We believe we achieved a substantial and outstanding result for the class, your Honor, consisting of six-and-a-quarter million dollars in cash. This fund will provide significant benefits to Riverbay's hourly employees and thousands and thousands of dollars to hundreds of individuals who work at Co-op City.

The Court is familiar with the claims and the facts, and we've submitted a very comprehensive declaration and several briefs. I'll just be very short in addressing with you, your Honor, our application for approval of the settlement and our request for attorneys' fees and expenses.

The first consideration in addressing the settlement, your Honor, is whether the settlement is procedurally fair, and here we believe it certainly is. This was a very intensively negotiated settlement over the course of approximately two months. The negotiations were arm's length. They were

adversarial. They were all undertaken in good faith. But they were very difficult and intense. And the parties started at widely different ends of the spectrum in terms of the numbers. In addition, the negotiations were overseen by a very experienced mediator, Martin Scheinman, during two separate sessions. And it was only after intensive negotiations -- not only during these sessions but on the phone, by e-mails that I was personally involved in -- that we were able to reach this resolution on behalf of members of the class. So from a procedural perspective, your Honor, we believe that the settlement is fair and merits approval.

From a substantive point of view we also believe that all the considerations that courts look at warrant court approval. This was, as the court recognized, a complex lawsuit. This is not a run-of-the-mill FLSA case on behalf of a couple of employees. There were complicated issues about the arbitrability of the claims asserted, the legal impact of setoffs, damage methodologies, the certifiability of the claims. So there were many complicated factual and legal issues that the parties confronted throughout the course of the litigation.

Another consideration here, your Honor, is the fact that after sending out 2,000 plus notices to members of the class we did not receive a single objection to the settlement.

The Court also, I'm sure, knows that there were

substantial discovery undertaken by class counsel in this case over a period of approximately two years. Thousands of documents reviewed, your Honor. E-mails, internal memos, collective bargaining agreements. We literally looked at hundreds, if not thousands, of pages of payroll records. We consulted with experts on multiple occasions going over damage methodologies and their analyses as to the scope of damages. We were in all respects, your Honor, fully informed about the strengths and weaknesses of our claims at the time we entered into these negotiations.

They were also substantial risks here, your Honor, that we confronted. While the Court had certified three separate subclasses, we certainly faced a risk of decertification. As you know, defendants had moved for decertification and also appealed before the Second Circuit for review of the decision pursuant to Federal Rule 23(e). There were, in addition to these appeals, substantial risks regarding the defendants' set off defense and certainly if the defendants were proven to be correct, that they, in fact, overpaid many employees, that could have substantially minimized, if not eliminated, the entirety of the compensation received by members of the class.

The ability to withstand a further judgment is also a consideration that warrants approval of the settlement. This is not a an ordinary situation involving a public company. We

have a cooperative here that is in somewhat financial distress. They did not have a lot of cash on hand. It's a financially distressed entity. There was a substantial mortgage that the co-op had executed with Wells Fargo. So, certainly had we litigated this case to trial and achieved a substantial verdict in our favor there was a risk and a real risk, as defendants told us throughout our negotiations, that the company might have to declare bankruptcy. So we had to seriously consider that risk throughout the course of negotiations.

In terms of the relationship --

THE COURT: The first two payments under the settlement have already been made?

MR. SHALOV: They have, your Honor.

In terms of the relationship to the best possible recovery, again, we think that this warrants court approval. It is a settlement that achieves a very significant percentage of the damages on a best case scenario basis. Our experts concluded that the total damages on a best case scenario were about $19 million. But that included liquidated damages. It included attorneys' fees. It included prejudgment interest. And there were certainly substantial doubts that we could achieve that number had we litigated the case to trial. So, our recovery at $6.25 million represents almost 35 percent of the total best case scenario damages.

Just looking at it from the total compensatory damages

perspective, the settlement fund of six-and-a-quarter million represents about 66 percent of the total settlement fund.

So in the context where settlements are frequently approved where the recovery is two, three percent of the total damages that could have been proven at trial, this recovery here is truly significant in terms of the relationship to the best possible recovery.

So, given that all these considerations, your Honor, we believe are in favor of approval of the settlement we respectfully request that the court finally approve the settlement.

THE COURT: There are no objections?

MR. SHALOV: None.

THE COURT: Correct?

MR. SHALOV: Correct.

THE COURT: There is no objector who has come here, right?

MR. SHALOV: No, your Honor.

THE COURT: There were 18 opt-outs and now one person reversed himself so there are 17 opt-outs?

MR. SHALOV: That's correct.

THE COURT: It's really picky but the first page of your memo says, "Plaintiffs and class counsel are pleased to present to the court for final approval a $6.25 settlement." Just left out "million."

MR. SHALOV: Looks like out we left out an important number. We apologize for that mistake.

THE COURT: 6.25 million.

MR. SHALOV: It is, your Honor.

If the Court has no further questions, I can turn to the request for attorneys' fees and reimbursement of expenses.

THE COURT: Right.

MR. SHALOV: Your Honor, the plaintiffs also request attorneys' fees representing one-third of the settlement fund and reimbursement of expenses totaling approximately $141,000. The specific numbers are contained in our settlement papers.

THE COURT: Right.

MR. SHALOV: Your Honor, we also believe this fee request is fair and reasonable and merits court approval. The Court, of course, is aware that this case was taken on a contingency basis. We certainly had no assurance that we were ever going to get paid. And this was a very complicated, difficult case. And so in a context where we had no assurance of any recovery and were litigating a very contested, highly risky case, the contingent nature of the relationship between plaintiffs and counsel is a factor for the Court to consider.

As far as the work is concerned, your Honor, we have talked about that at length in our declaration. It was truly a substantial undertaking on the part of class counsel over the course of approximately two years, your Honor. There were

about 22 depositions, 14 that we defended and 8 that we took, and substantial time and effort to prepare witnesses and to prepare for these depositions.

The documents we reviewed were in the thousands. As I said, your Honor, internal memos and collective bargaining agreements and e-mails and payroll records. I know Mr. Gallaway, in particular, and paralegals in my firm spent countless hours looking at payroll records, analyzing records and working with members of the class to go over those records. We engaged in over a hundred interviews of employees during the course of the litigation, your Honor, meeting with them, going to Co-op City, talking with them on the phone.

There were a substantial number of document requests in the multiple -- in multiple sets, document demands, interrogatory responses. This was an unusual situation where we had to literally get responses to interrogatories from about 170 people. And we had paralegals and lawyers calling employees on the phone, which was certainly no easy undertaking in itself because we didn't have contact information for a lot of them. And we were able to track down and get responses from about 116 employees that we submitted to the Court on a rolling basis.

The motion practice in this case, as the Court knows, was extensive. There were motions for collective certification, class certification, motions to compel

discovery, a motion for summary judgment, a motion for decertification, 1292 certification, sanctions, appeals. The work undertaken, your Honor, was truly substantial.

We conducted significant amounts of research. The drafting took place over weekends and nights, sometimes on holidays, often on an expedited basis. There was a period in August and September of 2014 where we were faced with four separate briefs that we had to draft and respond to, so that the motion practice and the work that we undertook in connection with that process was truly substantial and involved many, many hours of time and attention.

We consulted extensively with experts, your Honor. We spent many, many hours on the phone looking at damage analyses, looking over payroll records, talking on the phone with our experts, reviewing analyses with the experts. They truly did an outstanding job here, your Honor, and that was certainly a major aspect of the work that we performed.

We attended a number of court hearings both before your Honor and Judge Gorenstein, who was truly helpful and very helpful throughout the course of this case. The hearings took place over the phone and in person.

The settlement process was extremely arduous and long. We drafted comprehensive mediation statements. The negotiations took place over, as I said, about two months. Several mediation sessions, countless e-mails, countless

telephone calls. Took also a lot of time to work through the complexities of the settlement stipulation and the financial aspects of the settlement stipulation, the plan of allocation. So that was certainly a major aspect of the work that we performed.

So at the end of the day, your Honor, our firms collectively spent about 3,250 hours over the course of two plus years and we continue to work on the case, your Honor. We, in fact, even met with a class member outside today. We are on the phone with employees who call us up. We work with the experts in working through damage calculations. We're on the phone constantly with the settlement administrator, RG/2, which has also done an outstanding job in this case. So there is, in fact, work that will be done and is being done as we speak that's not included in our lodestar figure.

The complexity of the case we've gone over.

THE COURT: Could I just ask you a couple of questions?

MR. SHALOV: Sure, your Honor.

THE COURT: One is with respect to your hourly rate.

MR. SHALOV: Yes, your Honor.

THE COURT: You indicate in the papers that your hourly rate increased fairly recently.

MR. SHALOV: Yes, your Honor.

THE COURT: And the rate that you're putting in is

your current rate.

MR. SHALOV: That's correct, your Honor.

THE COURT: Even for the hours that you put in prior to the time that your rate went up?

MR. SHALOV: Yes, your Honor.

We've cited cases for you in the brief that stand for the proposition that in the circumstances -- a circumstance like this where the case proceeds over a period of years, that attorneys are entitled to utilize their current rates and not their historical rates. I can cite those for the Court if it wishes. It appears in a footnote in our fee application.

THE COURT: The other question is -- you plainly have set out in detail the work that you did which was extensive and the total hours that each of the lawyers spent. You also recite that you keep hourly records for all of your work but you didn't put in the hourly records as an attachment to the affidavit. I have no question that you put in the hours. My only question is whether under the current law you have to put in the printouts of your hourly rates so that I can make the spot checks to assure that the work was efficiently done.

MR. SHALOV: Two answers to that, your Honor. I did indicate in our declaration that we were more than happy to submit our time records to the Court if it wishes. I have the time records with me and certainly if the Court wants them I'm happy to produce them.

The cases on this are mixed, your Honor. I have seen cases where courts have asked for the hourly time records and I have seen cases where courts don't ask for the hourly time records, they are generally familiar with the work that was done, they have a summary of the hours spent by the lawyers, and that's sufficient, particularly when the lodestar multiple is relatively modest as it is here.

So I think the authorities go both ways, your Honor. Certainly in a fee shifting case, which this is not, you need to submit the time records. But since this wasn't a fee shifting case, we did not submit them, but I'm certainly happy to.

THE COURT: If you have them with you, you should pass them up.

MR. SHALOV: May I approach the bench, your Honor.

THE COURT: Sure.

They are actually less extensive than I would have thought.

MR. SHALOV: They are pretty detailed if you go through them, your Honor.

THE COURT: Well the type is very small. Okay.

MR. SHALOV: Shall I proceed, your Honor?

THE COURT: Yes.

MR. SHALOV: The complexity of the case is also another consideration. I've gone over that, your Honor. I

don't think I need to repeat myself.

The result achieved is also a factor for the courts to consider and I think, as I've said before, that this is a truly outstanding result for members of the class. This is a significant recovery. People are getting back thousands and thousands of dollars, some in excess of ten thousand, if not hundreds in excess of ten thousand. So I think it is a truly outstanding result that we accomplished really through significant toil and effort over the period of two years.

In addition, your Honor, there are no objections. We've sent out over 2,000 notices and not a single one objected to our fee request. We cited a number of cases in our brief, your Honor, supporting the proposition that awards of one-third are warranted and appropriate in these types of cases. So, there is clearly a sizeable precedent for the proposition that awarding a third is appropriate, particularly in a circumstance where all the other factors for courts to consider militate in favor of the fee request.

The Court, of course, is required to do a lodestar crosscheck. And we've submitted our hours, your Honor. We've also provided the court, you now have them before you, our time records. The multiple comes out to a very modest 1.41.

There is always, as the Court knows, some duplication of efforts given the complexity of a large class action like this where we had several lawyers working on the case. But

even if you reduce by some small percentage the lodestar figure to account for some duplication of effort, the multiple still is eminently fair and reasonable, your Honor, compared to other cases where courts have awarded multiples in the range of two, three, four, and sometimes higher. So from a crosscheck perspective, your Honor, we think that the lodestar figure and the multiple very much supports the fee application, your Honor.

So in conclusion, your Honor, we believe that all these factors warrant approval of the fee application in the amount that we requested.

THE COURT: Is there any reason that I should not include the detailed time records in the record?

MR. SHALOV: None from my end, your Honor.

MR. GINSBERG: No, your Honor.

THE COURT: I just raise that because sometimes there are issues of attorney-client privilege. Okay.

MR. SHALOV: If the Court has no other questions on the fee request, I'll turn to the expenses.

THE COURT: Thank you.

MR. SHALOV: Your Honor, we are requesting reimbursement of expenses in amount of $141,032.06. We've itemized for the Court the breakdown of these expenses and mostly half of them result or relate to the expenses incurred by our expert EmployStats. They have worked many, many hours,

your Honor, with us and independently creating very sophisticated computer algorithms, performing damage analyses, working with us on the telephone for countless hours, helping us with damage methodologies and the calculations for the settlement and the figures to include in the notice.

We had substantial deposition costs, your Honor. There were, as I said, 22 depositions and a number of hearings with court reporter costs.

We had appellate costs that we incurred in connection with briefing on the 23(f) or (e) -- I'm forgetting the letter -- application by defendants to the Second Circuit.

We copied thousands and thousands and thousands of pages in exhibits, in documents produced by the defendants, and for other copying purposes throughout the course of the litigation, your Honor.

There were mediation costs that we incurred in paying Mr. Scheinman of about $10,000. The rest of the expenses are associated with travel and other relatively smaller costs. These expenses came out-of-pocket, your Honor, with no assurance that we would, obviously, recover any of them. And obviously that's another factor for the court to consider in considering the fee request. But we believe these were reasonably and necessarily incurred, and we respectfully ask what the Court approve their reimbursement.

Finally, the service awards, your Honor. We have

asked for awards of $5,000 each to the five named plaintiffs. And this number, and I have seen many numbers over the course of years, and they go up as high as $50,000 to $75,000. We tried to be very modest and reasonable here. We just didn't ask the Court to compensate people for signing their name to a piece of paper. These five people did a lot of work. They worked with us on the telephone constantly. They reviewed pleadings. They were in constant contact with us. They produced documents to us. They appeared for depositions. They consulted with us in preparing for the depositions. They approved the settlement.

And so these people truly stepped forward and played a significant role throughout the process, and I'd like to express my approval on the record for their help and consideration. And three of these people, in fact, are still current employees of Riverbay and certainly bore not a small risk in stepping forward to bring a lawsuit against their employer to try to recover money not only on their own behalf but on behalf of their co-employees and it's truly commendable.

I have nothing further, your Honor. Unless the Court has any further questions, I am completed with my presentation.

THE COURT: No. Thank you.

Mr. Ginsberg, do you want to say something?

MR. GINSBERG: Sorry, your Honor.

I think Mr. Shalov pretty much presented it. Like his

firm, my firm did substantial work, appeared before you many times. I think you're familiar with the work, including summary judgment, opposition to summary judgment, and everything related to that. So I don't really have anything specific to add, your Honor.

THE COURT: Thank you.

Defendants.

MR. BARDAVID: Briefly, your Honor, we think that, from the perspective of the settlement, we still come to this from a position of obviously no admission of liability. We think this was difficult decision, one that your Honor knows, my client, Mitchell-Lama housing complex, we're talking about low and middle income individuals who ultimately bore the cost of the settlement in terms of a significant increase in their own costs but ultimately we faced the business decision and we made it.

With regards to the fee application and the rest, we simply take no position. We believe the Court can weigh the factors laid out by Mr. Shalov and determine what's fair and equitable for the class members. But as far as the overall settlement, we obviously support the settlement that was reached at arm's length after a lot of work by all parties. Thank you.

THE COURT: Thank you.

(Pause)

I've reviewed the papers and listened to counsel and it's plain that the settlement is fair, reasonable and adequate. The proposed order goes through the necessary factors. The settlement is procedurally fair. It was negotiated at arm's length by experienced counsel. There is no reason to believe that there was any collusion. It was arrived at with the assistance of a mediator. It's apparent that it was vigorously negotiated.

Substantively, it's fair, reasonable and adequate. This was very complex case that involved considerable difficulties in the stages of the case that preceded the settlement. If the case weren't settled there were considerable risks; risks maintaining the class, risks in being able to establish liability and damages.

The amount of recovery is well within the range of reasonableness. Whether it's viewed as somewhat in excess of 66 percent of the maximum compensatory damages or somewhat in excess of 32 percent of the maximum damages, the settlement is well within the range of reasonableness.

The fact that there were no objections to the settlement and only 17 opt-outs is strong evidence of the reasonableness of the settlement.

The notice to the class was consistent with Rule 23 and the best notice practicable under the circumstances and satisfies due process.

I scrutinize a request for attorneys' fees with great care because I appreciate that the attorneys' fees should themselves be reasonable. And if the attorneys' fees were reduced, the award may go to the members of the class.

This is a case in which there have been no objections to the attorneys' fees. But the Court has a responsibility to analyze the attorneys' fees independently. And the attorneys' fees that have been requested are reasonable. One-third of the settlement amount is well within the range of reasonableness. And there is no reason to alter that amount here. There were considerable difficulties in the case. The case was pursued on a contingent fee basis. The case took a reasonable amount of time to litigate and the plaintiffs' lawyers bore the risk of possibly not making a recovery. Judged against the lodestar as a comparator to assure reasonableness, the fee is reasonable.

The hourly rates were reasonable. The amount of time spent on the case was certainly reasonable. There were a great deal of -- there was a great deal of work that went into arriving at the point where the case was settled. And there is some additional work that will be necessary for which there will be no compensation other than the amount of the attorneys' fees that have been requested.

The number of hours is reasonable given the amount of work. And a review of the actual time records indicates that there is no excessive billing in the sense of, for example, an

unusually large number of hours that are billed in the course of a day for work so that the lodestar is a reasonable lodestar. The multiplier, as a crosscheck, is 1.41, which is well within the range of reasonableness. So that there is no reason based on the lodestar check to vary the amount of attorneys' fees that are being sought.

The amount of costs is reasonable, $141,032.26.

The amount of the service payments, $5,000 for the named plaintiffs, is also reasonable.

I have signed the order approving the settlement and I will see that it is filed today.

MR. SHALOV: Thank you, your Honor.

THE COURT: Anything further?

MR. SHALOV: Nothing here, your Honor.

MR. SMITH: Nothing here.

MR. GINSBERG: Thank you, Judge.

THE COURT: Good afternoon. Nice to see you.

(Adjourned)